UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>TROY JONES<br><br>Defendant | CRIMINAL No. 20-10217-DJC |

SENTENCING MEMORANDUM

Over the course of approximately four months in 2019, the Drug Enforcement Administration ("DEA") established that Defendant Troy Jones was trafficking fentanyl out of his home in Wareham, Massachusetts. The investigation that established Jones's conduct relied heavily on a confidential source ("CS") that made a series of controlled purchases from Jones (and his co-defendant, Kayla Nightingale) on behalf of the DEA. Tragically, the CS suffered a relapse in late-March and early-April 2019 and began buying fentanyl from Jones for his own use. The fentanyl purchased by the CS from Jones and Nightingale on April 2, 2019, resulted in his death from a drug overdose later that day. Under the factors that this court must consider pursuant to the sentencing guidelines and 18 U.S.C. 3553(a), the death that resulted from Jones's actions must result in an increased punishment. The government recommends a sentence of 120 months of incarceration and 60 months of supervised release.

Procedural Background

On September 29, 2020, a grand jury returned an indictment charging Jones and Nightingale with conspiracy to distribute and to possess with the intent to distribute fentanyl resulting in death, in violation of 21 U.S.C. § 846, and distribution of fentanyl resulting in death,

in violation of 21 U.S.C. § 841. (Doc. No. 1). On August 29, 2024, the parties executed a plea agreement pursuant to Rule 11(c)(1)(C) ("the Plea Agreement") in which the government agreed to dismiss so much of counts one and two as alleged that death resulted from the crimes charged in those counts and the parties agreed that the appropriate sentence for the defendant's crimes was between 72-120 months imprisonment. (Doc. No. 177). On August 29, 2024, Jones entered a guilty plea to so much of the two-count indictment as charged conspiracy to possess with intent to distribute fentanyl (count one) and distribution of fentanyl (count two). (Doc. No. 178). Pursuant to Federal Rule of Criminal Procedure 11(c)(3)(A), the Court deferred acceptance of the plea agreement pending preparation of a written Presentence Report ("PSR").

## Offense Conduct

In late January 2019, the DEA was contacted by the CS about a fentanyl dealer in Wareham, Massachusetts. The CS advised that Jones was dealing fentanyl out of his residence at 44 Barker Road in Wareham. The CS further advised that Nightingale lived at the residence too.

At the direction of the DEA, the CS made four, approximately ten gram controlled purchases of fentanyl from 44 Barker Road on February 6, February 21, March 11, and March 28, 2019. The CS was searched before and after each buy with negative results, provided with official advance funds ("OAF") by law enforcement to pay for each of the purchases, and provided the narcotics to investigators after each buy. The CS was provided with an audio recorder for each controlled purchase.

Specifically, the CS contacted Jones on February 5, 2019, and arranged for to purchase narcotics from his at his home the following day (February 6, 2019). On February 6, 2019, after meeting with law enforcement, law enforcement surveilled the CS to 44 Barker Road where he was observed entering the residence at approximately 1:30 p.m. During this purchase, Jones

advised the CS that he was waiting for a runner to deliver his product. Law enforcement then observed a vehicle at Jones's residence with a Rhode Island license plate and that departed the area around 2:14 p.m. Law enforcement observed Jones and the CS leave the residence together and Jones drop the CS off at a separate location. After Jones departed, the CS met with law enforcement and the CS provided the narcotics to law enforcement. Subsequent testing at the DEA laboratory confirmed that the narcotics were 9 grams of a mixture and substance containing fentanyl.

On February 21, 2019, law enforcement met with the CS to arrange a controlled purchase of ten grams of fentanyl. Jones directed the CS to meet him at his residence located at 44 Barker Road by 10:00 a.m. The CS was provided with $750 OAF for the purchase and was kept under surveillance as the CS travelled to Jones's residence. At approximately 10:08 a.m., the CS was observed entering Jones's residence. The CS exited the residence a short time thereafter and met with law enforcement where the CS provided the narcotics to law enforcement. The DEA laboratory confirmed that the narcotics were 8.9 grams of a mixture and substance containing fentanyl.

On March 11, 2019, law enforcement met with the CS to arrange a controlled purchase of ten grams of fentanyl. Jones directed the CS to meet Jones at his residence by 10:45 a.m. The CS was provided with $750 OAF for the purchase and was kept under surveillance as the CS travelled to JONES' residence. While the CS was inside of the residence, law enforcement observed a vehicle arrive and an individual briefly enter and exit the residence before departing the area. The CS departed at approximately 11:00 a.m. and met with law enforcement and provided the narcotics to law enforcement. The DEA laboratory confirmed that the narcotics were 6.28 grams of a mixture and substance containing fentanyl.

On March 28, 2019, law enforcement met with the CS to arrange a controlled purchase of ten grams of fentanyl. The CS was provided with $750 OAF for the purchase and was kept under surveillance as the CS travelled to Jones's residence. At approximately 11:00 a.m., the CS was observed in the driveway of the residence and at 11:15 a.m., the CS was observed exiting the residence. The CS then met with law enforcement and provided the narcotics, which the DEA laboratory confirmed were 10 grams of a mixture and substance containing fentanyl.

In a subsequent debrief, the CS advised that the residence was initially locked and the CS had to wait for Nightingale to arrive to let the CS inside. The CS indicated that the CS met with Jones, who provided the narcotics. However, a subsequent review of the audio recording by law enforcement revealed that Nightingale met with the CS on this occasion and Nightingale discussed what the CS wanted, confirmed the price, and made other statements related to narcotics. Location information for Jones's cellular phone also confirmed that Jones was not present for this controlled purchase.

The drugs purchased by the confidential source were tested at the DEA laboratory. DEA chemists confirmed that the combined net weight of all four controlled buys was 34.1 grams of a mixture and substance containing a detectable amount of fentanyl.

In addition, as part of the investigation, law enforcement identified another drug customer of Jones and Nightingale. At the time of the conspiracy charged in the indictment, this drug customer regularly bought what she thought was heroin from Jones and Nightingale. The witness would testify that she dealt with Jones and Nightingale interchangeably during the transactions.

The Death

According to phone records, on April 1, 2019, the CS contacted his father at 8:03 a.m. and then contacted both Nightingale and Jones multiple times. At approximately 9:22 a.m. that morning, the CS's father travelled with the CS to Rockland Trust located at 2995 Cranberry Highway, in Wareham, Massachusetts, to withdraw $200 at the CS's request. The CS's father then brought the CS to 44 Barker Road, in Wareham, Massachusetts, to provide the money to Jones. According to location information, Jones was present at 44 Barker Road and Nightingale arrived home at approximately 9:54 a.m. that morning.

The following day, on April 2, 2019, the CS called Jones at 7:40 a.m. Jones then called Nightingale at 7:55 a.m. Nightingale then called Jones twice at 7:55 a.m. and 8:19 a.m. The CS then spoke to Jones at 8:40 a.m. and Nightingale at 8:41 a.m. and 8:43 a.m. At 8:44 a.m., the CS called his father. The CS and his father then travelled to Rockland Trust, in Wareham, where the CS's father withdrew $200 at approximately 9:54 a.m. The CS's father provided the CS with money and then brought the CS to 44 Barker Road where the CS's father waited in his vehicle while the CS entered the Jones's residence with the money to purchase narcotics. Location information for Nightingale's cellular phone showed that Nightingale was present at the residence during this meeting. Location information for Jones indicated that Jones was on Cape Cod at the time of this meeting and was not present. Accordingly, on this date, the CS purchased narcotics from Nightingale. The CS's father then brought the CS home from 44 Barker Road and the CS was observed by a neighbor on the deck of his residence at approximately 10:30 a.m. Location information for the CS's cell phones indicated that he did not leave the general area of his residence that day.

5

At approximately 10:00 p.m. on April 2, 2019, Wareham Police Department responded to the residence of the CS based on a reported unattended death. Upon arrival, law enforcement found the CS unresponsive on his knees slouched over in a spare bedroom. According to the CS's girlfriend, she last spoke with the CS at 8:30 a.m. that morning when she left for work.

The Medical Examiner ("M.E.") conducted a full investigation, including toxicology of the confidential source. The M.E. concluded that the CS died of a fentanyl overdose (combined with ANPP, which is a fentanyl precursor). No other drugs were detected in the CS's bloodstream. The CS had no preexisting medical conditions.

### The Search Warrant and Additional Investigation

On April 3, 2019, the CS's girlfriend contacted investigators. She advised that Jones stopped by the CS's home to pick him up for work that day. She informed Jones about the death during that conversation. Based on that information, law enforcement obtained a search warrant for 44 Barker Road and executed that warrant at approximately 2:00 p.m. that day. Inside of the residence, investigators found a digital scale, a scale calibration weight, a cutting agent and multiple sandwich/corner cut baggies consistent with the earlier controlled purchases. On Nightingale's person, law enforcement recovered less than a gram of a mixture and substance containing fentanyl. Investigators also seized Nightingale's cell phone.

Investigators analyzed Nightingale's cellular phone and toll records for Jones, Nightingale, and the two cellular phones used by the CS during the investigation. Law enforcement observed that the call pattern on April 1 and April 2, 2019, between the CS and Jones and Nightingale was consistent with the coordination of the prior controlled purchases in this investigation in February and March 2019. Furthermore, the CS's call log for both April 1 and April 2, 2019, revealed no

6

suspicious or unidentified calls or texts with other potential sources of supply for narcotics in and around that date of the CS's death.

The Pre-Sentence Report and the Government's Request for an Upward Departure

The probation office has prepared a PSR which tracks the calculation of the sentencing guidelines set forth in the Plea Agreement. The applicable guideline is USSG § 2D1.1. The base offense level is 22, because the defendant is responsible for distributing 34.26 grams of fentanyl during the controlled buys. USSG § 2D1.1(c)(9). Jones received a two-level role enhancement because he planned and organized the drug distribution conspiracy and provided instructions to co-defendant Nightingale throughout. USSG § 3B1.1(c). Jones is also entitled to a three-level reduction for acceptance of responsibility. USSG § 3E1.1. With a total offense level of 21 and a criminal history category of III, the applicable guideline sentencing range is 46-57 months imprisonment.

The PSR identifies two separate grounds for departure from the applicable advisory guidelines range. First, the Court may depart upward because death resulted from the offense. USSG § 5K2.1. Second, the Court may depart upward to a higher criminal history category because of the defendant's lengthy criminal history and record, much of which is not scored. USSG § 4A1.3.

Here, because the drugs the defendant sold to the CS the day that he died caused the CS's death, an upward departure of 8 levels should be assessed and would result in an advisory guidelines range of 108-135 months. This upward departure is reasonable under the circumstances, grounded in the language of the Sentencing Guidelines, and comparable or lower than sentences other courts have imposed in similar drug overdose death-resulting cases. See, e.g., United States v. Carvajal, 85 F.4th 602, 613-14 (1st Cir. 2023) (GSR of 51-63 months, sentence

7

of 120 months, 8-level upward departure); United States v. McKinnie, 21 F.4th 283, 288 (4th Cir 2021) (GSR of 21 – 27 months, sentence of 120 months, 15-level upward departure); United States v. Heindenstrom, 946 F.3d 57, 61 (1st Cir. 2019) (GSR of 8 – 14 months, sentence of 60 months, 14-level upward departure, although affirmed as a variance); United States v. Waver, 754 F. App'x 56, 57 (2d Cir. 2019) (GSR of 33 – 41 months, sentence of 84 months, eight-level upward departure, although affirmed as a variance); United States v. Nossan, 647 F.3d, 822, 825 (8th Cir. 2011) (GSR of 10 – 16 months, sentence of 60 months, 12-level upward departure); United States v. Bollinger, 893 F.3d 1123, 1124 – 25 (8th Cir. 2018) (GSR of 6 – 12 months, sentence of 130 months, 22-level upward departure).  An 8-level departure is reasonable and appropriate as a result of the death caused by the actions of Jones and Nightingale.

The government does not seek an upward departure based on inadequacy of the defendant's criminal history category but has incorporated that criminal history into the recommendation set forth below.

## Crime Victims Rights Act and Restitution

As set forth in the PSR, the CS is the victim in this case.  PSR ¶ 24.  The offense conduct in the PSR establishes that death resulted from the conspiracy charged in Count One and the specific drug distribution charged in Count Two.  The defendant stipulated that death resulted as part of his plea agreement.  Doc. No. 177 at 2.  Accordingly, the CS was directly and proximately harmed by the commission of those offenses and qualifies as a crime victim under the Crime Victims Rights Act.  18 U.S.C. § 3771(e)(2)(A).  The family members of the CS will be acting as crimes rights victims on his behalf pursuant to 18 U.S.C. § 3771(e)(2)(B).  The government has conferred with the family of CS throughout every step of this prosecution pursuant to its obligations under the CVRA.  See United States v. Stevens, 239 F. Supp. 3d 417, 421, 422 (D.

Conn. 2017) (application of CVRA to family of overdose victim). The family is seeking restitution pursuant to 18 U.S.C. § 3663, which authorizes restitution for an offense under 21 U.S.C. § 841. At least one member of the family wishes to address the Court at sentencing, as is their right under the CVRA. Kenna v. U.S. Dist. Ct., 435 F.3d 1011, 1013 (9th Cir. 2006) (granting mandamus petition and vacating sentence where district court refused to hear victim allocution at resentencing). The government will provide the identity of the members of the CS's family that currently intend to speak by email.

Sentencing Recommendation

The government recommends a sentence of 120 months imprisonment. The factors outlined under 18 U.S.C. § 3553(a), including the nature and seriousness of the offense, the history and characteristics of Jones, the need for punishment, and for both specific and general deterrence, each support the government's recommendation in this case.

In this district we often talk about the dangers of fentanyl, but nowhere are these dangers clearer than in this case where the CS relapsed and died as a result of fentanyl provided by Jones and Nightingale. As the Court is aware, fentanyl is a deadly drug that has wreaked havoc in Massachusetts and beyond over the past several years. "Fentanyl is the deadliest drug threat the United States has ever faced, killing nearly 38,000 Americans in the first six months of 2023 alone. Fentanyl and other synthetic drugs, like methamphetamine, are responsible for nearly all of the fatal drug overdoses and poisonings in our country."[1] These grim statistics are not hypothetical – they describe the opioid overdose crisis occurring right now in this country and in this district – an

---

[1] U.S. Department of Justice Drug Enforcement Administration, *2024 National Drug Threat Assessment*, available at https://www.dea.gov/sites/default/files/2024-05/5.23.2024%20NDTA-updated.pdf., at 1(last visited August 12, 2024) (hereinafter "DEA 2024 Assessment").

epidemic that has lasted years and that will be felt far into the future. The epidemic is real and being felt every day by families across Massachusetts and New England, including the CS's own family in this case. The defendant's crimes played a role in fueling this epidemic and caused the death of another individual. The seriousness of this offense simply cannot be understated and there is a need here for a punishment that accounts for the defendant's conduct and his role in the CS's death in this case.

There is no question that Jones was the leader of the drug dealing partnership between Jones and Nightingale. Jones admitted as much in his plea agreement, and it was evidenced throughout this investigation in the CS's communications with both Jones and Nightingale. For example, as outlined in more detail in the PSR, on April 2, 2019 (the day of the CS's death), the CS started the day by calling Jones. Jones then called Nightingale. The CS then again spoke to Jones and then to Nightingale all presumably to make plans to meet in person so that the CS could purchase drugs from Jones provided by Nightingale. A review of Nightingale's phone also uncovered communications consistent with this sequence of events, where the CS would contact Nightingale only after being told to do so by Jones in order to coordinate a buy. While Nightingale provided the deadly dose of narcotics to the CS on April 2, 2019, this action was taken at Jones' direction, and Jones must be held accountable for his role in the offense.

Jones's history and characteristics also support the government's recommendation. Jones's history of narcotics trafficking and engaging in criminal conduct is abysmal. Beginning when he was seventeen years old and continuing until the criminal conduct at issue in this matter, Jones was convicted of a variety of both violent and drug related offenses. His criminal conduct increased in sophistication over the years including his conviction for selling cocaine and heroin out of his hotel room in 2015. PSR ¶ 60. The fentanyl trafficking conspiracy charged in this case

was not a one-time lapse in judgment by Jones but only the most recent example of a life spent distributing poison into the community in which he lives. The mercy that he received in the past provided him the opportunity to continue his criminal actions and ultimately led to the death of the CS. Indeed, Jones's criminal history is also much more significant than that of Nightingale, whether judged qualitatively or quantitatively.

Finally, a significant sentence of imprisonment is warranted to deter others from becoming involved in the trafficking of fentanyl, as the dangers associated with this deadly drug cannot be overstated. Based on the facts of this case, it is abundantly clear that fentanyl kills people, and those that choose to sell it are putting lives at risk every day. The CS's family will forever be impacted by the choices that Jones and Nightingale that culminated in the CS's death in April 2019. Imprisonment is necessary to send a strong warning to others who might otherwise consider distributing this dangerous drug.

## Conclusion

The government's recommendation of 120 months reflects the seriousness of the offense, Jones's personal history and characteristics, and the need to punish conduct that resulted in the death of the CS. The Court should sentence Jones to 120 months imprisonment, 5 years of supervised release, and order that restitution should be paid as reflected in the PSR.

Respectfully submitted,

JOSHUA S. LEVY
United States Attorney

By:   /s/ Jared C. Dolan
      JARED C. DOLAN
      J. MACKENZIE DUANE
      Assistant United States Attorney

11

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants .

/s/ Jared C. Dolan
Jared C. Dolan
Assistant United States Attorney


Date: December 4, 2024