UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>TROY JONES,<br><br>    Defendant. | Case No. 20-cr-10217 |

**DEFENDANT TROY JONES'**
**SENTENCING MEMORANDUM**

Troy Jones developed a lifelong substance abuse problem from an extremely young age as a result of horrific childhood abuse. Troy suffered physical and mental abuse by both of his parents. Troy's father held a knife to his throat when he was 5 years old. He was sometimes beaten so severely that he could not go to school. He was left alone with strangers. He watched both of his parents in the midst of serious substance abuse problems. And Troy's father ensured that Troy would follow the same path by introducing him to alcohol when Troy was 3 or 4.

To Troy's credit, this case has been a wakeup call to him. He went on suboxone two days after he was released from pretrial detention in this case in 2020 and he is still on it. He has stayed off drugs even through the stress of a pending federal criminal case. He has completed rehab and is in counseling and taking suboxone. Instead of dealing drugs, Troy now operates a landscaping business that keeps him busy and helps him support his family. He is an active and involved father and a loving husband. And he is determined that his children will have a better childhood than he did and will be productive members of society.

Even though Troy's own substance abuse is the result of harm that was done to him, he recognizes that is not an excuse for harming others. Troy deeply regrets that he sold DW the

drugs that killed him a short time later. He wishes to take this opportunity to apologize to DW's family and loved ones. Troy is sorry that his actions led to DW's death. And he is sorry that he involved his wife Kayla in the drug trade. Troy acknowledges that he is responsible for the consequences of selling a deadly drug. He never should have put others' lives at risk to support his own addiction. Troy has agreed to an above-guidelines sentence in an effort to atone for his actions, although he recognizes that there is no prison sentence that will bring DW back to his family and friends. Troy will spend the rest of his life engaged in the hard work of maintaining his sobriety to make sure that he never again contributes to the epidemic that has destroyed so many lives.

Troy entered into an above-guidelines C plea because he recognizes that a serious sentence is appropriate in light of the consequences of his crime. At the same time, Troy asks that the Court consider the substantial strides he has made since his arrest in this case. He has done what we ask of people who are accused of crimes. He turned his life around and has stopped using or selling drugs because he does not want to hurt anyone else. On balance, Troy asks that the Court sentence him to a term of 72 months' incarceration, which is a sentence sufficient but no greater than necessary to effectuate the purposes of 18 U.S.C. § 3553(a).

## ARGUMENT

The Sentencing Guidelines are advisory and are but one factor for this Court's consideration in imposing a sentence. *United States v. Booker*, 543 U.S. 220 (2005). The Supreme Court held in *Gall* that a district court should begin all sentencing proceedings by calculating the guideline range; and, after arguments by the parties, the "district judge should then consider all of the § 3553(a) factors to determine whether they support a sentence requested by a party" and in so doing, the district judge "may not presume that the Guidelines range is

reasonable." *United States v. Gall*, 552 U.S. 38, 49-50 (2007).  Instead, the Court must craft a sentence that is sufficient but no greater than necessary to achieve the goals of sentencing.  18 U.S.C. § 3553(a).  Moreover, sentencing must be individualized and must comport with the principle that "the punishment should fit the offender and not merely the crime."  *Pepper v. United States*, 562 U.S. 476, 487-88 (2011).  A sentence of 72 months is appropriate under the circumstances of this case.

## I.     History and Characteristics of Troy Jones

### A.     Family Background

Troy Jones had a "chaotic and terrible childhood."  PSR ¶ 91.  As his half-sister describes it, Troy's "Childhood from day one was abuse on every level and disfunction and substance abuse surrounding him."  Ex. A at 1-2.  His parents separated when Troy was 3 due to his father's alcoholism.  PSR ¶ 91.  But neither parent provided a safe environment for Troy until his teens.  Both parents were physically and mentally abusive.  PSR ¶ 92.  And both suffered from serious substance abuse problems.  PSR ¶ 92.  Troy describes his father as a "drunken mess."  PSR ¶ 92.  And his mother yelled and screamed while mixing alcohol with Valium.  PSR ¶ 92.

Troy experienced and witnessed extreme mental and physical abuse from his father.  He told Troy he wanted to kill him.  PSR ¶ 92.  His father held a knife to Troy's throat when he was 5 years old.  PSR ¶ 92.  He regularly beat Troy up.  PSR ¶ 92.  He made Troy fight his father's friends – grown men against a child.  PSR ¶ 92.  Troy once saw his father's girlfriend shoot at his father.  PSR ¶ 92.  When Troy told police where the gun was, his father beat him so badly he could not go to school for a week.  PSR ¶ 92.

Unfortunately, Troy's mother's residence was no refuge during his early childhood.  She frequently beat him with objects and left him outside in the snow.  PSR ¶ 92.  Her boyfriend beat Troy when he was 7 years old and threw Troy's sister down the stairs.  PSR ¶ 92.

Unsurprisingly, Troy spent as much time as he could at the Boys and Girls Club because he was too scared to go home.  PSR ¶ 92.

Troy was exposed to sexual content from a young age, with his father loudly playing pornography and having sex, and talking about hiring a prostitute for Troy when he was 10.  PSR ¶ 92.  And Troy was sexually abused by two different individuals beginning at the age of 6.  PSR ¶ 92.

When Troy was not being actively abused, he was neglected.  His mother would leave him with babysitters who suffered from their own substance abuse problem.  He recalls one incident where his mother left Troy and his sister at a stranger's home in Worcester.  She simply snuck out the back door and did not return for a week.

The family dealt with financial insecurity as well.  Troy grew up in public housing in Plymouth, Massachusetts and the family relied on public assistance.  PSR ¶¶ 90-91.  His basic needs were generally met, but Troy recalls times when meals consisted of a can of peas split between Troy, his father, and his sister.  PSR ¶ 91.  At one point Troy's father lost his home due to delinquent taxes and he lived at a campground for a year.  PSR ¶ 91.  Troy spent weekends and the summer with his father at the campground, where he had no access to showers or other basic utilities.  PSR ¶ 91.

Things began to improve when his stepfather moved in when Troy was 11.  PSR ¶ 93.  The physical abuse by Troy's mother stopped at this time.  PSR ¶ 93.  But he was still periodically neglected, with his mother and stepfather leaving for vacations while leaving Troy and his siblings with babysitters who had substance abuse problems.  PSR ¶ 94.

Troy's father passed away about 11 or 12 years ago.  PSR ¶ 91.  Troy also lost a half

brother to a drug overdose (or potentially to homicide) in 1995 when Troy was 16 years old.

PSR ¶ 99.

       B.      <u>History of Substance Abuse</u>

It has long been recognized that "children who are abused in their youth generally face

extraordinary problems developing into responsible, productive citizens." *Santosky v. Kramer*,

455 U.S. 745, 789 (1982).  Troy is no exception.

Troy started down the path of drug and alcohol addiction at an extremely young age.  His

father gave him alcohol at the age of 3 or 4, beginning a lifelong struggle with addiction.  PSR

¶ 120.  His father "introduce[d] Troy to drugs" and then "act[ed] proud that he sells them."  Ex.

A at 2. Troy was treated for alcohol abuse as a teenager.  PSR ¶ 120.  Troy started smoking

marijuana when he was 9 years old.  PSR ¶ 121.  He escalated to daily use by the time he was 11,

until he was 18 years old.  PSR ¶ 121.  But soon alcohol and marijuana addiction gave way to

addiction to harder substances.

Troy first tried cocaine when he was 17 or 18.  PSR ¶ 122.  He was a heavy cocaine user

between 2000 and 2015.  PSR ¶ 122.  He also added crack cocaine when Troy was 18 years old

and used that drug every weekend until 2016.  PSR ¶ 122.

Troy started using heroin at age 20 and used it daily for the next 21 years.  PSR ¶ 123.  At

some point he added fentanyl to the mix.  PSR ¶ 123.  These opioids were the most problematic

substances for Troy.  PSR ¶ 123.  He overdosed on fentanyl two or three times.  PSR ¶ 123.  He

missed work and risked driving under the influence.  PSR ¶ 123.  He was in and out of rehab but

continued to relapse.  PSR ¶ 123.  And Troy argued with his friends and believes opioids

"ruined" his relationship with his mother.  PSR ¶ 123.  He was buying and using drugs so often it

felt like a full-time job.  PSR ¶ 123.

Although heroin and fentanyl were probably Troy's biggest problems, he routinely ingested other drugs. He took oxycodone daily for five years. PSR ¶ 124. He used Molly, ecstasy, and MDMA daily for two years. PSR ¶ 124. He has also tried LSD-laced marijuana, acid, and mushrooms. PSR ¶ 124.

Troy also acted out in other ways. His criminal history shows he was first charged with assault and battery on a police officer as a juvenile at the age of 16. PSR ¶ 40. He continued to incur drug charges, assault charges, larceny charges, and motor vehicle offenses until his arrest here. PSR ¶¶ 41-60. By the time of the offense in this case Troy was selling fentanyl to others with similar substance abuse problems in order to support his own habit.

C.     Good Conduct Since Arrest

Troy's progress since his arrest in this case is truly remarkable. As his half-sister tells the Court, "Troy is not the person of his past. That person was a hurt, broken, desperate drug addict." Ex. A at 3. He has walked away from drugs and has been sober for over 4 years. Ex. A at 2. His growth over the last few years has been "remarkable." Ex. A at 9. He has stayed out of trouble, with no arrests since this case. And he has built a strong support structure that will help him maintain this progress for the rest of his life.

Troy has tried to get sober on and off since at least March 2005. PSR ¶ 116. He was in and out of substance abuse treatment at Habit OPCO and with other counselors. PSR ¶ 116. But nothing truly stuck until Troy was arrested in this case. Two days after Troy was released from pretrial detention he started on suboxone and began treatment at Steppingstone in New Bedford. PSR ¶ 117. This time the treatment worked. PSR ¶ 125. Troy completed that program on October 6, 2023. PSR ¶ 117. He continues to receive counseling. PSR ¶ 125, Ex. A at 3. He has had no positive drug tests during his pretrial release and one positive alcohol test over a year ago. PSR ¶ 5. Troy remains on suboxone today. PSR ¶¶ 115, 125. Troy's counselor believes

- 6 -

he is now a low risk for recidivism.  Ex. A at 8.  He hopes to continue substance abuse treatment while Troy is incarcerated, including staying on suboxone and hopefully participating in RDAP. PSR ¶ 126.

Troy has maintained his sobriety over the last few years even though he experiences regular pain from various injuries, including a chainsaw accident, a neck injury sustained when a deck railing fell, a car accident, and other medical conditions.  PSR ¶ 115.

Troy's efforts at turning his life around have not stopped with getting sober.  He has built a support structure of family and work that helps him stay on the right path.  Instead of dealing drugs to support himself, Troy now works hard in his own landscaping business.  PSR ¶ 128; Ex. A at 5-6.  He offers tree removal, lawn mowing and maintenance, yard cleanups, installs walkways, and other services.  PSR ¶ 128, Ex. A at 2.  Kayla works with Troy in the business and friends also help as needed.  PSR ¶ 128.  He also works odd jobs during the slower winter months, including carpentry, snow removal, and property management for AirBnBs.  PSR ¶ 129.

Perhaps the clearest sign that Troy has turned over a new leaf is that he has shown consistent good behavior over the last few years.  Troy's criminal history reflects the erratic behavior of someone in the midst of a serious substance abuse problem.  But that criminal history stops abruptly with Troy's arrest in this case.  Now that he is sober Troy is not dealing drugs or committing other crimes.

Troy has worked to build and maintain positive relationships with his family.  Although he is disappointed that his parents have not apologized for their abuse of him Troy does his best to set aside the past.  PSR ¶ 93.  He has even built a renewed relationship with his mother, who describes him now as a "man of integrity, kindness, and responsibility."  Ex. A at 5.  Most importantly, Troy is a loving and present father to his children and stepchildren.  Ex. A at 3, 6., 9

Troy is determined to give them a normal and positive life. The children live with Troy's

mother, who has stopped engaging in abusive behaviors.

And Troy draws significant strength and support from his relationship with his wife,

Kayla Nightingale. Troy and his wife are co-defendants in this case and used to deal drugs

together. They have both worked hard to get and to stay sober since their arrests in this case.

Although this case has certainly been a cause of stress in the relationship, they both reinforce the

significant progress the other has made. PSR ¶ 106. They are currently prohibited from living

together by their conditions of release but Troy and Kayle talk daily, work together in Troy's

landscaping business, and see each other several times a week. PSR ¶ 106. Because they have a

stable marriage and strong relationships with their children they are both better equipped to stay

off drugs and to make healthier choices going forward.

## II.    Nature of the Offense

Troy has pled guilty to one count of conspiracy to distribute and possess with intent to

distribute fentanyl in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C) and 846 and one count of

distribution of fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). Troy admits that he

sold fentanyl in order to support his own habit. To his great regret, Troy sold some of that

fentanyl with his wife and co-defendant. Although the government has dismissed the original

counts of the indictment insofar as it alleged that a death resulted from the offense, Troy also

acknowledges that he is responsible for selling the fatal dose of fentanyl that led to DW's death.

## III.    Sentencing Guidelines

Troy agrees with Probation's guidelines calculation, which is consistent with the

calculation set forth in the plea agreement. Because he is responsible for 34.26 grams of

fentanyl, Troy's base offense level is 22. U.S.S.G. § 2D1.1(c)(9). Troy's offense level is

increased by 2 levels because he is an organizer, leader, manager, or supervisor of criminal

activity under U.S.S.G. § 3B1.1(c). And Troy is eligible for a 3-level reduction for acceptance of responsibility. U.S.S.G. § 3E1.1. With a total offense level of 21 and criminal history category of III, Troy's guidelines sentence is 46 to 57 months' incarceration. Troy has agreed to a C plea for an above-guidelines sentence between 72 and 120 months' incarceration.

## IV.    Need for the Sentence Imposed

A sentence of 72 months, 15 months higher than the top of the guidelines range, is a serious sentence. Troy agreed to a C plea that calls for an above-guidelines sentence because he recognizes that DW's death sets this case apart from many other fentanyl cases.

But Troy's sentence should also account for the progress he has made since his arrest. Troy has already demonstrated significant rehabilitation. He is sober, on suboxone, and in counseling. He has turned away from dealing drugs and now spends his time with his family and building his landscaping business. Were it not for DW's death, Troy would be seeking a downward departure from the applicable guidelines range on the basis of his substantial efforts at rehabilitation. *See United States v. Wilkes*, 130 F. Supp. 2d 222, 240-41 (D. Mass. 2011) (applying downward departure where defendant remained drug free post-arrest after a decade of several alcohol and drug abuse, re-established family relationships, and maintained steady employment).

Troy's progress is reflected in his criminal history. As detailed in the PSR, Troy has a significant criminal history beginning when he was 16 years old. His prior charges were largely drug related although there are also assaults, motor vehicle offenses, and larcenies that took place when Troy was abusing drugs. There is no question that Troy was on the wrong path. But what is equally notable in Troy's criminal history is that it comes to an abrupt stop with his arrest in this case four years ago. He has not been arrested or charged with any other crimes during that

time.  That is because Troy has stayed off drugs and has directed his energy into more productive

activities like work and parenting.

A sentence of 72 months is more than sufficient for specific deterrence.  Rehabilitative

efforts are a factor that can be considered in determining whether the defendant is likely to

engage in future criminal conduct.  *See Gall v. United States*, 552 U.S. 38, 59 (2007).  Troy has

shown that this case has been a wakeup call for him.  He has internalized that his prior conduct is

not acceptable and that it must not continue.  And he has worked to build support systems to

ensure he stays out of trouble going forward.  Troy is well aware of the potential consequences

should he deviate from his current path.  Additionally, 72 months should be sufficient time for

Troy to participate in the RDAP program, which will provide him with a stronger foundation to

stay off drugs when he is released.

An above-guidelines sentence of 72 months is also sufficient for general deterrence.  It

sends a message that dealing fentanyl, even to support one's own drug habit, is a serious offense.

And it tells others in Troy's position that every time they sell even a relatively small quantity of

fentanyl, they are running the risk that someone might die and that the dealer can face higher

penalties as a result.

## V.      Need to Avoid Unwarranted Sentencing Disparities

The parties have agreed to a C plea with a sentence between 6 and 10 years.  Those

figures represent the low end and the high end of sentences received in recent cases in this

district that originally had death resulting charges.  The defense is aware of two prior cases in

this district that charged the defendant with drug distribution resulting in death.  *See United*

*States v. Ashworth*, Docket No. 19-cr-10477-WGY; *United States v. Carvajal*, Docket No. 20-cr-

10023-GAO.  Both of those cases involved circumstances that warrant a higher sentence than

Troy's case.

Even those cases are outliers.  Unfortunately, we are in the middle of an epidemic of overdose deaths.  For example, the Massachusetts Department of Public Health estimates that there were 2,125 opioid-related overdose deaths in Massachusetts in 2023, and that was a 10 percent decrease compared to 2022.  *See* Ex. B.  Prescription opioids were only present in 7% of those deaths.  *Id.*  It would be reasonable to infer that the vast majority of opioid-related overdoses therefore involved illicit opioids and not legal prescriptions.  But very few of those deaths ever lead to charges against the dealer for distribution resulting in death.  To the extent those dealers are prosecuted, it is usually for the distribution itself without an upward departure for the death.  That is to say, the fact that Troy was charged with a death resulting offense and that he has agreed to above-guidelines sentence already means he will be punished more severely than other comparable defendants.

And Troy's conduct warrants a sentence no higher than either Mr. Carvajal or Mr. Ashworth.  In *United States v. Ashworth*, Docket No. 19-cr-10477-WGY, the defendant went to trial and was convicted on several drug charges but acquitted on the death resulting aspect of those charges.  Mr. Ashworth's girlfriend went to his residence and the two used drugs in his bedroom.  He was present when she died and he made no effort to get help or to call an ambulance.  Instead, he left her body in his bed for 3 days.  He ignored messages from her family trying to find her and he told the police he had not seen her in weeks.  Mr. Ashworth's guidelines sentencing range was 60-71 months, higher than Troy's guidelines range of 46-57 months   The Court departed upward by one month and sentenced Mr. Ashworth to 72 months' incarceration.  That is true even though the government made a recommendation (10-12 years) that overlaps with its recommendation here (10 months).

Mr. Carvajal also went to trial and was convicted of distribution and acquitted on the death resulting aspect of that charge. *United States v. Carvajal*, Docket No. 20-cr-10023-GAO. His guidelines range of 51-63 months was also higher than Troy's guidelines range. The government made the same 10-12 year sentencing recommendation that it made in *Ashworth*. Mr. Carvajal sold fentanyl to a man who had been sober for several months. Mr. Carvajal continued to pester him for months to try to get him to relapse. Ultimately the victim did relapse and he died of an overdose 11 days later.

Troy's conduct warrants a lower sentence than in *Ashworth* or *Carvajal*. Most importantly, Troy has demonstrated significant rehabilitation by getting sober and sustaining that sobriety for 4 years, during which he has not incurred any new criminal charges. That factor alone warrants a lower sentence in this case. Troy has accepted responsibility and agreed to plead guilty. And Troy's post-arrest conduct is not the only distinguishing fact. Troy's offense conduct is less culpable than in either *Ashworth* or *Carvajal*. Troy was not with DW when he died and he was not in a position to get medical assistance for DW while he was overdosing. He certain did not, as Mr. Ashworth did, watch someone die and do nothing whatsoever. And Troy did not push DW to relapse. There is no reason to think Troy even knew that DW had been sober. (Although it appears that DW was sober during the controlled buys in the months leading up to his death, those buys would have looked like regular drug transactions to Troy.)

Troy's conduct also warrants a lower sentence than in *United States v. Pina-Agee*, Docket No. 19-cr-10163-IT. Although Mr. Pina-Agee was not charged with a death resulting count and did not go to trial, his conduct suggested that he is a greater danger to society than Troy ever was. The government alleged at sentencing that Mr. Pina-Agee was responsible for at least 2 overdose deaths (and potentially more), that he used guns to conduct business and threatened

rivals and associates, and that he led a drug network with close to a dozen associates. Mr. Pina Agee also faced a 5 year mandatory minimum based on the quantity of drugs that he sold. The Court sentenced him to 84 months' incarceration. The defense's sentencing recommendation of 72 months (one year less that Mr. Pina-Agee) appropriately recognizes that Troy is responsible for a serious offense while also avoiding an unwarranted sentencing disparity compared to Mr. Pina-Agee's case.

Finally, several of the cases cited by the government in its sentencing memo demonstrate that its recommendation of 120 months is higher than necessary in this case. For example, in *United States v. McKinnie*, 21 F.4th 283, 292 (4th Cir. 2021), the Fourth Circuit affirmed a 120 month sentence where the defendant knew his drug supply was causing overdoses and continued to sell it anyway, a fact the district court found to be "absolutely stunning." That is a factor not present here. The defendants in two cases cited by the government received sentencing of 60 months, 12 months less than Troy is requesting here. *See United States v. Heindenstrom*, 946 F.3d 56, 61 (1st Cir. 2019), *United States v. Nossan*, 647 F.3d 822, 825 (8th Cir. 2011). A sentence of 72 months in Troy's case is appropriate to avoid unwarranted sentencing disparities.

## CONCLUSION

For the foregoing reasons, Troy Jones respectfully submits that a sentence of 72 months' incarceration is sufficient but no greater than necessary to effectuate the purposes of 18 U.S.C. § 3553(a).

Dated: December 4, 2024                          Respectfully submitted,

                                                 TROY JONES

                                                 By his attorneys,

/s/ Megan A. Siddall
Megan A. Siddall (BBO No. 568979)
Miner Siddall LLP
101 Federal Street
Boston, MA 02110
Tel. (617) 202-5890
msiddall@msdefenders.com

Elyse M. Hershon (BBO No. 691815)
240 Commercial St., Suite 5A
Boston, MA 02109
Tel. (617) 982-2892
hershonlaw@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that this document was served on December 4, 2024 on counsel for the government through electronic mail.

/s/ Megan A. Siddall
Megan A. Siddall